17-1271 ed. L. Appalachian Voices, ed. L. Petitioners v. Federal Energy and Reservatory Commission Mr. Luckett for the petition, Ms. Perry for the respondent, and Mr. O'Neill for the interveners. Mr. Luckett. May it please the Court, my name is Ben Luckett and I represent the petitioners. I'd like to reserve three minutes of my time for rebuttal. Now FERC asks this Court to bless an approach to reviewing pipeline certificate applications whereby a producer of gas can guarantee that its project will be approved every time without offering any extrinsic evidence of the public need for the pipeline's additional capacity. All a company needs to do to secure approval for a pipeline, and it wants to build, and with it the extraordinary power to take and permanently alter private property, is create a corporate affiliate to propose the project, and then enter into contracts for pipeline capacity with that affiliate. And moreover, FERC asks this Court to allow it to authorize Mountain Valley to immediately take and alter private property along the more than 300 mile pipeline route before landowners can raise their statutory and constitutional objections to the taking. It also asks that it be allowed to authorize pipeline construction before completing mandatory review of potential measures to protect important historic properties and without ever meaningfully analyzing the project's substantial impacts to the climate and water quality. This Court must reject FERC's request because it's contrary to the Natural Gas Act, NEPA, the National Historic Preservation Act, and the Fifth Amendment to the U.S. Constitution. The Natural Gas Act prohibits the construction of a pipeline unless FERC reasonably finds that it is required by the public convenience and necessity. But in practice, FERC reads the words required, public, and necessity out of the statute altogether, and instead authorizes construction of any pipeline that is merely desired by a private entity willing to speculate that it will ultimately be able to find a market for its gas. That approach is contrary to the statute and to FERC's own certificate policy statement Aren't there contracts for 100% of the gas? Yes, Your Honor. All of those contracts, however, are with affiliates of the pipeline developer. Right, but still, they're contracts to buy the gas, right? Yes, Your Honor, they are. However, as expert studies submitted into the record, as well as Commissioner Glick's dissent explain, contracts between affiliates are not the result of the same sort of arm's-length negotiations that would indicate market demand. Is there some evidence that these are not legitimate contracts? The fact that the ultimate destination for more than 80% of the gas was unknown at the time that the contracts were entered into tends to demonstrate that there's a lack of public demand, or at least that such public demand has not been demonstrated. Why would they enter those contracts if they were not at least convinced that there wasn't going to be a market? Well, Your Honor, they may very— These are not captives. In fact, they were the creators. These are not subsidiaries of the carrier or the pipeline company. So why would they contract to buy the package that they're contracting for if they were not aware of a market for the gas? It's speculation, Your Honor, that a market will in time develop. And I think that given the grant of the extraordinary power of eminent domain here, FERC has to do more than— Well, it's not an extraordinary power. It's a power that's there in all the pipeline cases that we hear. Yes. Yes, Your Honor. But FERC has a responsibility to the public in granting that power. And FERC, in order to determine, again, according with the statutory language, that these pipelines are required by the public convenience and necessity, I believe that they have to do more than simply rely on the speculation of a private entity. It says it has to be a retail market to create convenience and necessity. This is a market, a wholesale market essentially, but it is a market to the five corporations who have contracted to buy 100 percent of the gas. These are the shippers that have contracted. These are not end users who have— They're not end users. That's why I'm calling them wholesalers, because that essentially is the comparison to the pre-market entities upon which this would all be based if there weren't for the regulations. But they are purchasers. They are buyers. They are creating a demand for that gas that's passing through the pipeline. So is there any reason why shippers couldn't be considered the market for purposes of convenience and necessity? I think under the facts of this case and the evidence that was present in the record here, it was unreasonable for FERC to rely exclusively on those agreements. Well, we come back then to the arbitrary and capricious standard in governing what we're reviewing. Yes, Your Honor. Petitioners do not dispute that in some cases precedent agreements by themselves may be adequate evidence of public benefits of a pipeline. So why is it unreasonable? FERC says these are legally binding contracts. Affiliates are not. They're legally binding contracts, and it wouldn't make any economic sense for the shippers to enter into them unless they thought the gas would have use. And they're putting skin in the game, which tends to show that they're making their best judgment about future demand. It doesn't seem unreasonable. And it is unreasonable for FERC to defer its analysis entirely to the willingness of these particular entities to enter into those contracts under the facts of this case, where we have expert reviews in the record showing that there is already sufficient capacity in the region to be served by the pipeline and that, in fact, that doesn't even include new pipelines serving the same region that FERC has since approved, such as the Atlantic Coast Pipeline. And as other studies submitted into the record show, there is a threat of a significant overbuild of the takeaway capacity from the Marcellus region. And I think heightened scrutiny of those affiliated agreements was particularly necessary in this instance because of one of that expert evidence in the record to which FERC did not meaningfully respond. They pointed out in petitioner's study but didn't analyze how that flaw would specifically affect the conclusions. And so it was particularly important for them to give higher scrutiny, given the adverse effects to landowners and communities of this substantial pipeline that were on the other side of the balancing test that FERC performs to determine whether a project is in the public convenience and necessity. That's something that sets this case apart from some of the other precedent of this court where they have allowed precedent agreements to demonstrate public need. There was no imminent domain, certainly not the substantial amount of imminent domain, along this 300-mile pipeline route in those other cases. Mr. Olcott, you can use your oral argument time any way you want, but you've raised at least 16 different arguments in your briefs. Are there other issues that you want to emphasize here today that you want us to pay special attention to? Yes, Your Honor. And is downstream greenhouse gas emissions one of them? It is. FERC's NEPA analysis was fatally flawed because it failed to meaningfully analyze the substantial impacts of the project on climate as well as water quality. What about its analysis of the downstream greenhouse gas effects under the Natural Gas Act? Well, it refused to do any analysis of those downstream effects. It refused to take these downstream emissions into account when doing its public interest balancing under the Natural Gas Act in what can only be seen as thumbing its nose. And so here's my question for you about that. As I understand the commission's position on that, it said that the downstream emissions were not reasonably foreseeable because it doesn't yet know who the customers are. And you challenged that in your brief. And you argue that in addition to considering them, the commission should have used as a methodology for doing it the social cost of carbon, right? Yes, Your Honor. Some available tool, one of which is the social cost of carbon. Well, do you recommend any other tool? The social cost of carbon was the only one I saw in your brief. Yes, that is the one that other agencies have deemed useful and FERC has even admitted are useful for other agencies. So my question is this. It's true that the commission said we don't have to consider these downstream effects. And, you know, you make a good argument that that may be wrong. But the commission did explain in considerable detail why the social cost of carbon wasn't a particularly useful tool here. It said there's no consensus about the discount rate. It said that the tool doesn't measure actual incremental effect. It said that there's no established threshold. It said that, you know, it wasn't quantitative. They gave all these reasons. But I didn't see anywhere in your brief where you challenged anything in your opening brief. Did I miss something? This may have been primarily in the reply brief. Well, that's why I asked you about the opening brief. Yeah. You see why I'm asking the question? The reason I'm asking the question is that even if you're right, if you think this perception of the case is wrong, you should speak up. But even if you're right that the commission was wrong when it said the downstream greenhouse gas emissions are not reasonably foreseeable, even if you're right about that, the only technique you've suggested for evaluating the significance of those emissions is the social cost of carbon. The commission explained in detail why it didn't think it would work, and you didn't respond. So my question is why isn't that whole argument forfeited by you? In other words, we don't have a basis for setting this aside because you only argue for the social cost of carbon, and you didn't challenge the commission's reasons for not using it in your blueprint. In the opening brief? Yeah. We argued that they should have used the social cost. And the dissent, which was particularly surprising because the dissenting commissioner spent quite a bit of time explaining why those reasons weren't legitimate. But you didn't argue it in your blueprint. As you mentioned, Your Honor, there were 16 separate arguments to be included in this brief, and space was allocated. You know the rules of this court. I mean, you have to make your arguments in your opening brief. Otherwise, they're forfeited. I believe even without the social cost of carbon, the fact that FERC failed to consider them indirect effects, even without the further step of monetarily quantifying those effects, even if they had just admitted, yes, these 2 billion feet a day, yes, cubic feet a day. Well, it did do that, didn't it? It did what we required them to do in Sierra Club, right? It quantified the emissions. I thought your major objection was that it never considered the significance of it, right? Also that it failed to consider them as an indirect effect. It said, FERC said that it was not going to take these emissions into account as part of its decision making. And so even if they were to disclose a full burn estimate, but then on the other hand they say, but in fact those emissions are not a reasonably foreseeable cause, result of this project approval, that is fundamental. Unless they actually consider those emissions as an effect of the project, then the purposes of NEPA are not served. Purposes of NEPA are to generate information to inform the agency's decision making and public scrutiny, right? It doesn't compel one outcome or another. And on the question of what information they generated in the EIS, the same reaction as Judge Tatel, which is one case says they must quantify the amount of CO2 emissions from downstream burning. And another case says that they don't have to go the next step and try to predict what impact that CO2 emission will have on climate change and somehow try to monetize the present value of that. So they generated all the information that we said they have to, and they didn't generate a separate set of information that we've said they don't have to. I think the failure is their failure to actually use that information. They said explicitly that they did not believe it was an indirect effect of the project and could not deny a pipeline on the basis of those emissions. So regardless of disclosing that information, that's one purpose of NEPA. The other purpose is to actually inform the decision making. And FERC has been explicit that its calculation of greenhouse gas emissions did not inform its decision making as NEPA requires. Do you want me to set the time? Yeah, you set your time. I'll give you a minute. We'll hear from the commission. May it please the court, Lona Perry for the commission. With regard to the issue of need, the commission reasonably determined, this court has repeatedly held that the commission can use precedent agreements as evidence of demand for a public convenience and necessity finding. And in this case, the only thing that was different about this issue was the fact that the contracting parties happened to be affiliates, and the commission reasonably concluded that, given the fact that those affiliates were at risk for the cost of that capacity, under their 20-year long-term contracts, that they would not have reasonably entered into those contracts without an anticipation of there being demand, ultimately, for the gas that they were transporting on the pipeline. With regard to the greenhouse gas emissions, the commission also, as it pointed out in its orders, did what this court required it to do in the 2017 Sierra Club decision and calculated the greenhouse gas emissions and also compared those greenhouse gas emissions to national and to regional inventories. And this court in Sierra Club did not require the further step of trying to link those greenhouse gas emissions to actual climate change impacts, and the commission reasonably concluded that it had no way of doing that because the tools for that simply don't exist. The social cost of carbon tool was not appropriate, and there was no other way to give significance to the figure to determine whether or not the project was unacceptable because of the greenhouse gas emissions. I want to be totally sure I understand the commission's reasoning here. You're right about what the commission said about the social cost of carbon. Explain why I didn't think it was a useful tool, but there was an antecedent discussion which had to do with whether the downstream greenhouse gas effects were reasonably foreseeable, and the commission said they were not, right? That's right, Your Honor. And, of course, the dissent says, well, wait a minute. What sense does that make? It's true the case is a little different from Sierra Club because we don't know who the customers are, but as you just said, 100% of this is covered by contracts. That gas is going to be burned, and it's going to emit greenhouse gases, correct? Right, Your Honor. What difference does it make that we don't know at this very moment who the downstream customers are? As you just said, the commission based its public interest determination on the fact that there was 100% demand for it. Right, Your Honor. I think if you look at note 814 in the rehearing order, which is in the joint appendix at 1926, the commission there explains that while the burning of the gas might ultimately be foreseeable, what the commission lacks is any information regarding where the gas is going in the sense of whether it will result in increased consumption versus will it be substituted for other existing sources, and will that be coal, will that be other gas? Well, on the substitution question, we said in Sierra Club, the commission is free to make that argument, document it if it wants, but it's got to show that that's, in fact, a possibility. That's not in here. There's nothing in here. Well, that's the problem, Your Honor, is the commission says because we don't know where the end use of this gas is going to be, we aren't able to make that calculation. But what Sierra Club says is you can't, the commission can't rely on that without documenting it. And as the dissent said, I mean, you don't, the commission has no doubt that this gas is going to be burned, and this isn't like ozone or another pollutant, whose effects as local greenhouse gases, greenhouse gases, we all know, go immediately to the upper atmosphere wherever they're burned. So, you know. Yes, Your Honor, but the situation here, as the environmental impact statement said, the alternative fuel in this region is coal. And so to the extent that you are talking about what the gas is substituting for and who is going to be burning it, it can make a great deal of difference in terms of the net amount of greenhouse gases that are produced. Sure, because none of that analysis is in here. I'm sorry, Your Honor? I didn't see that. I know the commission said that. Well, right. But there isn't any actual analysis of any of that data. Well, exactly, because the commission said because they didn't know where the gas was going. Well, that's my point. You haven't explained to me why yet, what the dissenter says in here is that the commission should have just assumed, since it's covered by, since 100 percent of the transmission is covered by contracts, that all that gas, every molecule of that gas will be burned, and those molecules will produce greenhouse gases. Next question should be, okay, maybe the greenhouse gases produced by that will be far less than alternatives, which would produce X. But there's none of that in the order. Right, because the commission didn't feel like it had the information necessary to make that determination. Okay, all right, all right. We're going in circles. Let me ask you a second, and we'll go ahead. Oh, I'm sorry. I was just going to point out, Your Honor, that the commission specifically pointed out the fact that it complied with this Sierra Club decision and made the calculations that were required, and they also pointed out in the rehearing order at note 769, 1914 of your joint appendix, that even if they are wrong about it being, whether or not it is foreseeable, the commission's discussion in these orders and in the environmental impact statement complied with the CEP procedures for inadequately missing information. Right, I understand that. I mean, you heard my questions to Mr. Luckett. I mean, I get that point. Right. Yes, Your Honor. Okay. But let me ask you a second question. Okay. This relates to this. Mountain, the intervener, makes an argument that considering downstream greenhouse gas effects is not even within the commission's jurisdiction under the National Gas Act. And the commission mentions that a couple times in the tour, but am I reading the commission's decision correctly if I said the commission's reasoning is, one, these were not reasonably foreseeable, and number two, even if they were, there's no real effective tool for evaluating their significance. Is that right? That's right, Your Honor. Yes, Your Honor. In other words, I didn't read the commission as saying we don't even have statutory jurisdiction to consider this, right? Oh, no. Am I right about that? I think that the only discussion that had anything to do with that was the commission talking about if it's not within the scope of its NEPA obligations, did it have some independent duty to look at greenhouse gases if it wasn't within the scope of its NEPA obligations? But that was the only – Well, has the commission held that in any other cases? Are there any commission decisions where the commission says that environmental issues are beyond its jurisdiction under the Natural Gas Act when it does the balancing of public interest versus adverse effects? No, Your Honor. It hasn't ruled that, right? No, Your Honor. I mean, the description of the balancing is it looks first at the economic effects. Right. And then if that balancing works out, then it goes on to look at the environmental effects. But that is the balancing process. You mean under NEPA? Yes. Well, the environmental effects under NEPA, but it's all – Also under the Natural Gas Act? Right. In other words, could the commission deny a certificate because of adverse environmental effects? Has the commission ever ruled one way or another on that issue? Well, certainly this court has said in Sierra Club that the commission could deny the certificate if it found that the environmental impacts were so severe. Right. Right. Okay. Great. Thank you. That's very helpful. Any further questions? Thank you. Okay. We'll hear from the intervener, Mr. O'Neill. May it please the Court, my name is Brian O'Neill, and I'm appearing this morning on behalf of the respondent interveners in this proceeding. Judge Tatel, with respect to the downstream greenhouse gas emissions issue, I think you understand, but it's important that – Don't assume I understand anything. Just explain it. This case is significantly different than the Sable Trail case, the Sierra Club case, the so-called Sable Trail case. Without conceding the causation part of the equation here, in Sable Trail this court concluded that it was reasonably foreseeable to determine where the gas was going to – where the end use was going to be. It was going to be at power plants in Florida, identifiable power plants. And that's just not the case here. But why? Why? Because while you're correct, Your Honor, that gas is – there is – You don't have any doubt that this is all going to be burned, correct? Every molecule – Well, it could be used for some chemical or feedstock purpose, and there could be some that wasn't burned at all. We don't know. We could all go with that, I guess. What we don't know is whether some of this or all of it will be used to offset the burning of other fuels, such as coal and fuel oil. We don't know whether some of it will be for new demand or some of it will be to replace existing demand for competitive purposes. We just don't know. No one knows. The commission doesn't know. It didn't do an analysis because it doesn't know where it's going. No one does. And in addition, I point out that under the commission's rules, the shippers of the gas here can have the ability to release capacity when they're not using it. They can release capacity on an interim basis. They can release their capacity on a long-term basis to third-party shippers. We don't know who those third-party shippers would be. We don't know where the gas would go if those third parties were shipping the gas. So the commission – the point here is the commission did distinguish this case from Sable Trail, and it went a step farther, however. Without conceiving the causation factor, the FERC did provide a quantitative estimate, and then it put that in context, comparing it to regional and national numbers. So the commission's decision is readily defensible. Finally, I'd put my two cents' worth here on the need factor. On the what factor? The need. The commission concluded that this project is in the public convenience of necessity and is needed, and it's needed because there are six contracts with six separate shippers for the entire capacity of this project, and these are not insubstantial shippers. It's not the Acme Haunting Company here. These are people who are willing to risk substantial amounts of money, and the commission has concluded, consistent with its policies and precedent, that that is an adequate indication of need. Okay. Thank you. Thank you, Your Honor. Mr. Luckett, you were out of time, but we'll give you two minutes. On the social cost of carbon issue, I'd just like to point out first that petitioners in their opening brief did fault FERC for admitting that that tool is appropriate for use by other agencies in their project-level reviews, similar to this review, and for failing to explain why that was different. And the only explanation that FERC offered was that it was not the legally relevant cause of the emissions and that these other agencies that had used this tool before appropriately were, in fact, the legally relevant cause. And, of course, that claim that FERC here is not the legally relevant cause is what this court rejected in Sierra Club. And so that all of the other critiques of the social cost of carbon really fall away when we see that FERC admits that it is useful for other agencies, but is only not useful because of a reason that this court explicitly rejected in Sierra Club. Now, FERC also said, appeared to say, at FERC's counsel when it was up here, that it does indeed consider environmental effects, even when not explicitly part of its NEPA analysis, it considers those in its Natural Gas Act balancing. But FERC said precisely the opposite of that in the Dominion Transportation case that petitioners cited on page 49 of their brief, where it said that FERC does not consider environmental effects outside of its NEPA analysis. And I'd just like to conclude by saying that if indeed FERC's argument about not being the legally relevant cause of the emissions and that all of this gas would be burned anyways, that the shippers would find different ways to get their gas to markets, if that fact is true, it, of course, severely undermines their finding of public convenience and necessity. Thank you. Case is submitted. Stand, please.
judges: Tatel, Katsas, Sentelle